BEATTY, Justice.
This is an appeal by the plaintiffs from summary judgment in favor of the defendants in plaintiffs’ action to contest the will of the parties’ father, Murphy Anderson Heard. We affirm.
Plaintiffs (James Hubert Heard, William David Heard, Elmer Dean Heard, Alton Eugene Heard, Mildred Odell Bishop, Ina Cathleen Marberry, Marjorie Jones, and Opal Joyce Hereford) and defendants (Harvel Anderson Heard and Lola Mae Ferguson) are the surviving children of Murphy Anderson Heard, deceased, and the sole beneficiaries named in his last will and testament executed April 18, 1983, and admitted to probate by the Probate Court of Madison County, Alabama, on October 4, 1983.
The undisputed facts pertinent to this appeal follow: Defendant/proponent Harv-el Anderson Heard suffers from mental and physical disabilities and, as a result, is unable to work. He lived his entire life at home with his father until the father died. The other defendant/proponent, Lola Mae Ferguson, a widow, lived with her father and brother during the nine months preceding the father’s death. During this time, Lola Mae spent 25 days in the hospital room with her brother Harvel, who was at that time seriously ill and not expected to live. It was also during this nine-month period that the parties’ father, Murphy Anderson Heard, executed his last will and testament in the presence of three witnesses: Martha A. Shelton, Joan McGuire, and Mary Haney. It is also undisputed that a Donald D. Taylor prepared the will of Murphy Heard at the request of Murphy Heard’s long-time friend, James C. Rainey. According to Rainey’s deposition, Murphy Heard gave Rainey a piece of paper with the names of his children on it, told him what he wanted each to have, and asked that Rainey have a will prepared for him. Donald Taylor deposed that he did prepare Murphy Heard’s will as a favor to Rainey. The pertinent provisions of Murphy Heard’s will are set out below:
“ITEM TWO
“I give, devise and bequeath to my beloved sons, James Hubert Heard, one-hundred ($100.00) dollars; William David Heard, one-hundred ($100.00) dollars; Elmer Dean Heard, one-hundred ($100.00) *1110 dollars; and Alton Eugene Heard, seven hundred-fifty ($750.00) dollars.
“I give, devise and bequeath to my beloved daughters, Mildred Odell Bishop, one-hundred ($100.00) dollars; Ina Cathleen Marberry, one-hundred dollars; Marjorie Jones, one-hundred ($100.00) dollars; and Opel Joyce Hereford, seven hundred-fifty ($750.00) dollars.
“ITEM THREE
“All the rest, residue, and remainder of my property, both real and personal, of whatsoever kind and character, and wheresoever situated, including all property over which I may have a power of appointment, I give, devise and bequeath to my beloved son and daughter, Harvel Anderson Heard and Lola Mae Ferguson, who have provided me with loving comfort and care, through health and illness, the essentials necessary for my survival, and the luxuries that have made my life most pleasant and happy, in equal shares.
“ITEM FOUR
“If my son Harvel Anderson Heard, and/or my daughter, Lola Mae Ferguson shall die under such ■ circumstances that there is not sufficient evidence to determine the order of their deaths, or if he or she should die within a period of ninety (90) days after my death, then all bequests, devises and provisions made herein shall be administered, distributed and assumed by the other survivor.
“ITEM FIVE
“I nominate and appoint my son, Harv-el Anderson Heard, and my daughter, Lola Mae Ferguson as sole Executors of my estate. If my son or daughter should predecease me or fail to qualify or having qualified should die, resign or become incapacitated, then I nominate and appoint as Successor Executor, the survivor Harvel Anderson Heard or Lola Mae Ferguson.”
Shortly after Murphy Heard’s death, his will was admitted to probate and the defendants were appointed executors. Thereafter, the plaintiffs filed this contest, alleging four grounds. On January 22, 1985, the trial court entered a pre-trial order wherein the plaintiffs agreed that their contest would be based on only two of the grounds alleged: (1) undue influence and (2) lack of testamentary capacity on the part of their father. On March 12, 1985, the defendants filed their motion for summary judgment, basing it
“upon the pleadings in this cause, including all proceedings in the Probate Court for Madison County, Alabama, wherein the Will involved in this case was admitted to Probate on October 4, 1983, including the original copy of the Will, attached affidavit of Martha A. Shelton, Joan McGuire, and Mary Haney, attached affidavit of Lola Mae Ferguson, and all depositions taken in this case, including the depositions of the following persons: Harvel Anderson Heard, Ina Cathleen Marberry, James Herbert [sic] Heard, Elmer Dean Heard, Alton Eugene Heard, Donald D. Taylor, Lola Mae Ferguson, James E. [sic] Rainey, Opal Joyce Hereford, Marjorie Jones, and William David Heard.”
Defendants supplemented their motion for summary judgment to add certified copies of all the proceedings in the probate court. The trial court granted the defendants’ motion. Although in its order, the trial court states that “[t]he Plaintiffs, prior to the day of hearing of said Motion for Summary Judgment, have served opposing affidavit,” we have not found this “opposing affidavit” in the record of this case. The trial court denied plaintiffs’ motion to vacate its order, and this appeal followed.
At the outset, defendants cite, among other cases, Berry hill v. Mutual of Omaha Ins. Co., 479 So.2d 1250 (Ala.1985), in support of their motion to dismiss the appeal, and argue that, because a substantial portion of the record considered by the trial court in granting defendants’ motion for summary judgment, was initially omitted from the record certified on appeal, the judgment below is due to be summarily affirmed. This argument, however, was rendered moot when the Madison Circuit Court sent to this Court the omitted por *1111 tions of the record, explaining that the depositions were inadvertently omitted on original submission of the record on appeal. See Rule 10(f), A.R.A.P. Appellees’ motion to dismiss the appeal, therefore, is due to be denied.
Defendants also contend that, by failing to argue in their brief the father’s lack of testamentary capacity, plaintiffs have waived that issue on appeal, although it was raised below. We agree.
It is well settled that the “failure to argue an issue in brief to an appellate court is tantamount to a waiver of that issue on appeal.” Ex parte Riley, 464 So.2d 92, 94 (Ala.1985). Therefore, the only remaining issue on appeal is whether the material submitted by defendants in support of their motion for summary judgment established that there were no genuine issues of material fact. Stated differently, the issue is whether there is a scintilla of evidence supporting plaintiffs’ claim that the will of their father was the product of undue influence on the part of the defendants. Arrington v. Working Woman’s Home, 368 So.2d 851 (Ala.1979).
Notwithstanding that, in their brief, plaintiffs failed to cite this Court to any specific portions of the record which plaintiffs would contend suffice as the requisite scintilla, we have, nevertheless, read the record in its entirety and, based on that reading, we conclude that the defendants were entitled to summary judgment.
The contestants of a will who allege undue influence bear the burden of proof. On summary judgment, where the proponents of the will have supported their motion with evidence establishing that the testator executed his will under his own volition and devised his property in accordance with his free will and desires, the contestants must adduce at least a scintilla of evidence as to each of the following elements in order to defeat the motion: “(1) that a confidential relationship existed between a favored beneficiary and the testator; (2) that the influence of or for the beneficiary was dominant and controlling in that relationship; and (3) that there was undue activity on the part of the dominant party in procuring the execution of the will.” Windham v. Pope, 474 So.2d 1075, 1077 (Ala.1985) (emphasis added); Jackson v. Davis, 398 So.2d 242, 244 (Ala.1981); Pruitt v. Pruitt, 343 So.2d 495, 499 (Ala.1976). The scintilla rule, however, “is not satisfied by speculation” and the “evidence to support undue influence must provide at least a reasonable inference, rather than mere suspicion.” Arrington v. Working Woman’s Home, 368 So.2d 851, 854 (Ala.1979). Moreover, “not all influence is undue; any influence resulting from sympathy and affection only is not disfavored.” Jackson, supra, 398 So.2d at 244; Pruitt, supra, 398 So.2d at 499.
In this case, the affidavit and deposition of defendant Lola Mae Ferguson, the affidavit of the three women who witnessed the testator’s execution of his will, together with the depositions of James C. Rainey and Donald D. Taylor, establish that the last will and testament of Murphy Heard was the product of his own sound free will and choice. He made his testamentary dispositions without the knowledge of either defendant, and those dispositions, especially to the defendants, were consistent with the circumstances of his life at the time they were made. Lola Mae had lived with the testator and her brother (co-defendant) for nine months prior to the testator’s death. During that time, she had taken care of both of them, and had, in fact, expended a large sum of her own money to pay for medical insurance and medical bills incurred by her brother Harv-el. In his deposition, James C. Rainey explained how Murphy Heard came to ask him (Rainey) to get a will prepared for him (Heard), and Rainey specifically explained in detail the circumstances and events surrounding the making of the will in question:
“Q. Did you know Mr. Heard during his lifetime?
“A. Yes, sir.
“Q. And for how long did you know him?
*1112 “A. 50 years — 55.
“Q. During his last few years, did you have an opportunity to have any conversations or contact with him on a personal basis?
“A. Yes, sir.
“Q. And did you talk to him about a will preparation?
“A. We talked about practically most anything, I guess, that two people could talk about, yes, sir.
“Q. Did you ever do anything to assist him in preparing a will?
“A. What do you mean by ‘assist’?
“Q. Did you take him to have a will prepared?
“A. No, sir, I did not.
“Q. Did you discuss with him what he wanted in a will?
“A. We talked about it.
“Q. Did you take down any information and try to get someone else to prepare a will for him?
“A. I did take the information, and someone else did prepare it.
“Q. And when did you take this information from him?
[[Image here]]
“A. It was sometime later in the winter or spring. It must have been in January or February or March.
“Q. Of 1983?
“A. Yes, sir, March or April.
“Q. Would you relate for the record just when and how that conversation took place, where you got the information for him to prepare a will.
“A. We talked about many things that came up in life. He used to be sort of the man in that community that looked after so many things, especially if someone was in trouble or death or sickness. And we were funeral directors. He bought caskets from my daddy when we were at Blanche. That’s when we moved to Ardmore.
“He would talk about things that happened that he and my daddy had done. Anything that I wanted to know, we went out and talked to him about things that happened in the community, just like you would anyone else. I played checkers with him and talked with him a lot. And we would get to talking about the way things were back years and years ago and the way they are now, and the cost of things, all along. Sometimes I would be just sitting there talking to him.
“He talked about the money situation. He had a money market, and I don’t know if I ever went down there that he didn’t ask me, ‘What did the money market do today?’ He was wanting to know what the money market was. After Harvel was operated on, one day we talked about the high cost of being sick and being in the hospital, going to the doctor, all those things. And I said, ‘Well, no one realizes what it’s like until they go through it.’ I said, T had a spell of sickness, and it’s unbelievable what it costs.’ And I said, ‘I’ve seen some of the bills of what Harvel had.’ And he said, ‘Well, I’ve heard about them, too. It’s hard for me to believe.’ And I said, ‘Well, unless anyone goes through it and sees it or experiences it....’
“We would talk along those lines, and after this all happened to Harvel, I said, ‘Well, no one has helped Harvel to bear this expense except Lola.’ I said, ‘This needs to be taken care of, Mr. Heard.’ And he said, ‘Yes, I know it does, James.’ And he said, T would like for Harvel to be taken care of, and I would like Lola Mae to have what money she has spent here but I don’t know whether I’ve got that much money.’ And I said, ‘Well, have you made any provisions towards that end?’ And he said, ‘Well, my property, my land was divided up not too long ago between the children.’ But he says, ‘What little I’ve got left is money and not too much of that.’ I said, ‘Well, it ought to be fixed.’ And he said, ‘Well, Harvel’s name is on the CD that I have, and Lola Mae’s name is on the checking account.’ I said, ‘Have you given the other children anything, have you made provisions for them?’ He says, ‘Well, if they are to get anything at all, it would be very *1113 little. I have enough money to pay what I owe Lola Mae for Harvel’s expenses.’
“So one time I saw him and he says, ‘Did you tell me one time that you could get a will fixed?’ I said, ‘Mr. Heard, I would try to do anything I could for you.’ He pulled out a piece of paper and said, ‘I have the names here on this piece of paper.’
“Q. Did he at that time give you that piece of paper?
“A. Yes, sir.
“Q. And did he at that time have anything on that piece of paper that would indicate what he wanted each to receive?
“A. He just told me what he wanted to put on it.
“Q. And did you write that down at that time?
“A. I put it on a piece of paper, yes.
“Q. On the same piece of paper with the names?
“A. On a separate piece of paper.
“Q. Did anyone else know about your preparing this will at this time?
“A. Nobody except the people preparing it.
“Q. Did you tell Lola Mae about this?
“A. No, sir.
“Q. Did you tell Harvel about this?
“A. No, sir.
“Q. And the people who prepared the will, who were they?
“A. Don Taylor.
[[Image here]]
“Q. And when did he prepare this?
“A. Well, I told you, dates I don’t know.
“Q. Was it pretty close to the time that it was signed?
“A. I would say Mr. Heard had this in his possession 2 to 4 weeks before it was signed. That would be just a rough guess. Like I say, I couldn’t tell you.
“Q. Did you bring it back to Mr. Heard?
“A. I brought it back and laid it on his table in his room and said, ‘There is the document that you wanted.’
“Q. And did you tell anyone else about it?
“A. No, sir.
“Q. Did you tell Lola Mae?
“A. No, sir. I was sitting there talking to him one day; took it out of my pocket as I started to leave.
“Q. Just the two of you were present?
“A. There was other people in the house but there was nobody in his room.
[[Image here]]
“Q. Now, the preparation of the will was done, you say, by Mr. Taylor.
[[Image here]]
“Q. Did he volunteer to make [the will] for you or for Mr. Heard?
“A. He said, ‘I’ll make it,’ and it wasn’t specified.
[[Image here]]
“Q. During this period of time did you discuss with Mrs. Ferguson the fact that a will was being prepared?
“A. If she knew it was being prepared, that’s not to my knowledge.
“Q. It’s your testimony that you had no decision about that?
“A. No, sir. I promised that I would never tell her. As long as Mr. Heard was alive I didn’t tell her.
“Q. Were you aware of any plans that Mr. Heard had for dividing the money that he had in his money market other than according to the will?
“A. He just told me, he says, ‘HarvePs name is on the money market.’ And so I guess I thought that eliminated that part of it.
“Q. He didn’t discuss with you the fact that he wanted to divide his money with his children?
“A. Nothing except what he’s put in his will. That’s all.
[[Image here]]
*1114 “Q. Mr. Rainey, you took this will that Mr. Taylor had prepared; did he find something wrong with the first one that you took to him?
[[Image here]]
“A. I believe it was the day that I took it to him. He asked me to read it to him. And he says, ‘There is one name left off.’
“Q. And then you had to go back—
“A. To have it corrected.
“Q. —to get that name added onto it?
“A. Yes, sir.
“Q. And then after that was done, did you take it back to him?
[[Image here]]
“Q. I mean, did you deliver the will back to Mr. Heard?
“A. That’s when I delivered it to him, yes. The last time that I delivered it was at his home, and I left it on the table.
“Q. Now, did you leave the first copy?
“A. No, sir.
“Q. You did not leave the first one with him?
“A. No, sir. I met him — he and Lola Mae— ... The way I remember it, they were at the drugstore one day. Lola Mae had gone in the drugstore, and I was at the post office. And they were at the back of the drugstore. And I saw the car over there. And I had this with me. And I just walked over there and talked to him and read it to him. And that’s when he told me that one name was left off of it. That’s the way I remember it.
[[Image here]]
“Q. Now, how long a period of time did it take you to go over the will; that’s what I’m asking?
“A. Oh, I don’t know. It was just long enough to read it through. And he caught that that name wasn’t on it right off.
“Q. So then he asked you to take it back?
“A. He says, ‘You’ll have to put the other name on it, this won’t stand like this. I don’t want it like this.’
“Q. And Lola Mae wasn’t present?
“A. No. She was in the drugstore.
“Q. And Mr. Harvel Heard wasn’t present?
“A. No. Harvel was home, as far as I know.
“Q. To your knowledge, they didn’t know anything about the will at that point?
“A. Not that I know of, no, sir. If they did, someone else told them.
“Q. Do you recall whose name was left off of the will?
“A. I believe it was Elmer.
“Q. Do you still have the list of the names that he gave you?
“A. No, sir.
“MR. ALEXANDER: I’ve got it.
“Q. Did it have Elmer’s name on it, or do you recall?
“A. Yes, it was on it. It was on the copy. I suppose — I don’t know this to be a fact — but he had down on there so much land to each one. It was a copy of the land as it was divided up, each name for that.
“Q. And that was the listing that he gave you?
“A. Yes, sir.
“Q. It wasn’t written out in his handwriting?
“A. No, sir. It was someone else’s. He had it in his pocket; took it out of his pocket and gave it to me.”
In her deposition, Lola Mae Ferguson explains that her father told her about his will after it had been prepared, and that he specifically asked her to arrange for the women he knew working at the Bank of Ardmore to witness his will:
“Q. You’ve heard Mr. Rainey’s testimony concerning the preparation of this will; did you know anything about this will when it was being prepared?
“A. No, sir.
“Q. Did you find out about it before you took your father to have the will signed?
*1115 “A. I found out about it the 18th of April of ’83.
“Q. And was that the day that it was signed?
“A. Yes, sir.
“Q. Did you have any conversations prior to that time with Mr. Taylor concerning this will?
“A. No, indeed, no, sir.
[[Image here]]
“Q. Now, during the time that Mr. Taylor was preparing this will at the request of Mr. Rainey, did you have any conversations with him at all concerning the will?
“A. With Mr. Taylor?
“Q. Yes, ma’am.
“A. No, sir.
[[Image here]]
“Q. Now, let’s go hack to the execution of this will: Did you take your dad to the bank to have him sign the will?
“A. Yes, sir.
“Q. Who all went?
“A. Nobody went with us, my dad and I.
“Q. Your brother didn’t go?
“A. No, he didn’t go.
[[Image here]]
“Q. And you went with him specifically to the bank to have this taken care of, this will?
“A. To get that done, yes, sir.
“Q. You knew that he had the will with him?
“A. Yes, sir. In fact, he stuck it in my purse just like he did his monthly checks.
“Q. You went with him, and had you already made arrangements for some of the women there—
“A. Well, that’s what I started to say. He told me he wanted Martha Shelton the No. 1 to witness that will.
“Q. Is Martha a good friend of yours?
“A. Well, she wasn’t near as good a friend of mine as she was my daddy’s. My daddy didn’t let nobody wait on him but her. He’d stand back in the line longer than this building to let Martha wait on him if she was in the bank.... He thought a lot of Martha. And Martha did daddy.
“Q. Do you recall how the execution of the will took place; were you present when he signed his will?
“A. Yes, sir.
“Q. Did he read the will over at that time?
“A. No, sir.
“Q. Did he say anything?
“A. Daddy got a check — and these farmers are familiar with it, these farmers over here. And he got letters from the ACR, whatever you call that office. But, anyway, it was a letter, and it was folded in a way that nobody seen nothing on it where he was going to put his name. And their names, of course, come under his.
“Q. You’re saying that he didn’t even show them that it was a will that they were witnessing?
“A. He told me — well, I don’t know how it was, whether he said it or what. But, anyway, I called Martha and I told her, I said, ‘Daddy says he’s got something he wants y’all to witness.’ And I said, ‘He thinks you’re No. 1.’ And I said, ‘He has mentioned Linda Rose....’ And she told me at that time, ‘Linda isn’t in but Joan McQuire is in.’
“So Joan and Martha and Mary Ann, I guess, did. So I took it out of my purse, and it was in a brown envelope. He pulled it out of there, still had it covered in a way for them girls not to see, for me not to see, for nobody not to see other than himself. And he put his name on it.
“Q. And did he tell them what he was signing?
“A. Well, really, I don’t — they’ll have to say on that. He picked them girls. To my knowledge, I don’t know. I wouldn’t say if he did or didn’t.
“Q. You were right there where you could hear what was going on, were you not?
*1116 “A. Yes. I was standing right here and Daddy was right here. And this is Martha’s teller, and Mary Ann come to this teller from hers, and Joan came from that one.
“Q. Were you standing up while they signed this?
“A. Yes, sir.
“Q. You didn’t have to go to a table or any place to sit down?
“A. No, sir. He didn’t have to have no glasses neither.
“Q. And he signed, and then the witnesses signed?
“A. Right.
“Q. Do you recall any other conversation that took place at that point in time about the will?
“A. No, sir.
“Q. Now, what did he do with the will after that?
“A. He gave it to me and he told me not to open it until after he was gone. And I switched it around to several different places after awhile. And I wound up putting it on the floor of my ’81 Pontiac. And it stayed in there until— I’ll say 8 to 4 weeks after his death. And I called Linda, Mr. Alexander’s secretary. And I told her that my daddy had a will, and it never had been read. And she said, ‘Girl, what are you talking about?’ She said, ‘That needs to be seen by him.’ And I said, ‘Well, he told me not to do nothing with it till after he was gone.’
[[Image here]]
“Q. ... After you got the will and after you talked to Mr. Alexander’s secretary, what, if anything, did you do?
“A. After I talked to Linda, she told Mr. Alexander that I had called. And Linda called me back, and she told me that Mr. Alexander told her to call me; that he would help me out.
“Q. And you subsequently saw him?
“A. He has been my attorney — well, he made my husband’s will. And he called me back, I mean, she did. And Mr. Alexander said that he would do what he could on our daddy’s will.
“Q. He then filed a petition to probate the will?
“A. Yes, sir.
[[Image here]]
“Q. And it is your testimony that you did not tell Mr. Taylor what to put in the will?
“A. ... No, indeed.
“Q. And you didn’t tell Mr. Rainey what you wanted in the will?
“A. No, indeed.
“Q. And you had no conversations with Mr. Taylor?
“A. Noway.”
The three women who witnessed Mr. Murphy Heard’s will submitted a statement in the form of an affidavit in which they stated the following:
“Murphy Anderson Heard, at the time of the execution of his said Will, had memory of mind sufficient to recall and understand the property he was about to bequeath or devise. At the time he executed his said Will, William [sic] Anderson Heard apparently knew the property which he owned, and the character and the amount of his property, he knew who his relatives were, and what their relation was to him, and he was of sound mind. At the time of the execution of his said Will, Murphy Anderson Heard was appropriately dressed and orientated as to where he was, and he was not intoxicated, and he was not under the influence of intoxicants, all of which was clearly exhibited to the undersigned by his behavior and mannerisms. At the time that Murphy Anderson Heard executed his said Will, he was completely competent to transact ordinary business, and was competent to handle the details of ordinary business, and he was able to successfully carry out the ordinary affairs of life; he had absolutely no slurred speech, he had no odor of alcohol on his breath nor any such odor otherwise, and he was not staggering, but moved about in his usual fashion. At the time that he executed his Will, his speech and mannerisms, including his ability to walk and *1117 move about, were all normal. Each of the undersigned knew Murphy Anderson Heard prior to the date of his executing his Will, and each of the undersigned had been in his presence on many occasions prior to his executing his said Will. The undersigned never at any time saw or observed Murphy Anderson Heard under the influence of any type of intoxicants. At the time that he executed his Will, he exhibited a normal mental, emotional, and physical state.”
As we have previously stated, this Court has read the entire record in this case, including the depositions of each of the contestants who were deposed. In those depositions, the contestants concede that during the last nine months of their father’s life, defendant Lola Mae was the primary caretaker of their father and their handicapped brother, Harvel, although there is much animosity and resentment expressed toward her for this very fact. Indeed, most of the contestants claim that they did not see their father and brother as much as they would have liked because of Lola Mae’s presence.
Assuming, arguendo, that this period of assistance to her father established a confidential relationship between Lola Mae and her father, there is no evidence whatsoever that she was the dominant party in that relationship, or that she was active, directly or indirectly, in procuring execution of the will. “The activity must be in procuring the execution of the will and more than an activity and interest referable solely to a compliance or obedience to the voluntary and untrammeled directions of the testator.” Arrington, supra, 368 So.2d at 853. No reasonable inference of such activity can be established from the contestants’ assertions that Lola Mae is “overbearing,” untrustworthy, and not worthy of belief. Nor can such activity be inferred from their contentions that their father had said years earlier that “he would never make a will” or that “if he had been going to make a will, ... he would have talked it over with one of the bunch.” The contestants conceded that their father could have changed his mind. Furthermore, undue activity cannot be inferred from the contestants’ statements that their father always treated his children alike and equally, except for Harvel, nor from their claims that their father had told them that Lola Mae had “given him more trouble and more heartache and worry than all the other nine put together,” and “that her name would never be on none of his money; that she had spent Emmett Ferguson’s money, and she was not going to spend his.”
Nor did the contestants adduce a scintilla of evidence that either Lola Mae or Harvel was the dominant party in their relationship with their father. The contestants concede that Harvel was not guilty of any undue activity, even though he and Lola Mae were treated equally in their father’s will. And, time and time again, the contestants themselves acknowledged the independence of mind of the testator. Pruitt, supra, 343 So.2d at 499. For example, they deposed that their father was a strong-minded man who refused to go to a doctor despite the urgings of his children. Specifically, Ina Cathleen Marberry deposed:
“Q. You said you had never taken your daddy to a doctor and you had never taken your daddy to a hospital; is that true?
“A. That’s right.
“Q. And that was because your daddy told you he didn’t want to go?
“A. He had said he didn’t want to go....
“Q. And you mentioned that when your daddy told you something, then that’s the way it was?
“A. That’s right.
“Q. He was what you would call a strong-willed person?
“A. He was—
[[Image here]]
“A. He stood his ground.
“Q. He stood his ground; that was his nature; wasn’t it?
“A. That’s right. And we respected it.
“Q. Each one of y’all did?
*1118 “A. Most of us did. Some of them didn’t.
[[Image here]]
“Q. And like you said, your daddy was always a strong-willed person, and you couldn’t talk him into going to a doctor or a hospital even up to the point of his death?
“A. He didn’t want to.
“Q. And so you couldn’t overcome his will even up to the time he died; could you?
“A. No.
“Q. He was a strong-willed person up to the moment he died?
“A. Now, I don’t know that he knew what was going on, you know, a few hours before he died.
“Q. But let’s say up until 2 or 3 days before he died, he was a strong-willed person?
“A. Right.
“Q. And that was his nature?
“A. Right.”
The contestants also deposed that their father was not insane, and that he knew his children and the contents of his property until his death.
We have thoroughly sifted the evidence in this case, and we are, nevertheless, unable to find even a scintilla of evidence that gives rise to a reasonable inference of undue activity on the part of Lola Mae Ferguson. The fact that she was living with the testator during the time the will was drafted and that she took him, at his request, to the bank, where the will was executed does, not, in and of itself, constitute undue influence. “While this may have presented an opportunity to exercise influence,” there is no evidence whatsoever of any undue activity on the part of the proponents to procure a more favorable bequest in their father’s will. Jackson, supra, 398 So.2d at 244. The contestants’ evidence as a totality presents nothing more than suspicion and speculation that undue influence may have been present. Id. “There must be some evidence that the favored beneficiary played such a part in the procurement of the will that the testator did not make the will under his own volition or devise his property in a manner consistent with his free will and desires.” Windham, supra, 474 So.2d at 1078. No such evidence was introduced in this case.
As an aside, we note that, based on the depositions given by all parties, it appears that it is purely a matter of speculation as to the size and value of the testator’s estate, especially after the specific bequests of money are given to the contestants under the terms of the will. Apparently, pri- or to making his will, the testator had divided all his realty among his children, and this division included the testator’s home, which he had deeded to defendant Harvel Heard. Much is made of the purported $40,000 (plus interest) certificate of deposit, of which all or most of the children were aware. The depositions indicate that this certificate of deposit had been issued jointly to the testator and his son Harvel, so that, upon the testator’s death, Harvel became the sole owner of the certificate of deposit. Therefore, the sum represented by the certificate of deposit would not be included in the testator’s estate. Some of the contestants claimed that their father kept a large, but undetermined, amount of cash hidden throughout the house, and that he owned a few cows and a truck. Based on the evidence as a whole, it is indeed possible that, after funeral expenses are paid and the bequests given, the remainder of what Harvel and Lola Mae are to divide equally will not amount to much more than that received individually by the contestants themselves. If that is indeed the case, Lola Mae and Harvel could not even be considered “favored beneficiaries.”
For the foregoing reasons, the judgment below is due to be, and it is hereby, affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, AL-MON and HOUSTON, JJ., concur.